## THOMAS v. UNITED STATES.
## SIMONS v. SAME.
### IJAMS v. SAME.
### Nos. 531–533.

Circuit Court of Appeals, Tenth Circuit.
April 11, 1932.

Charles B. Hudson and Austin M. Cowan, both of Wichita, Kan. (Herbert E. Ramsey, of Hutchinson, Kan., on the brief), for appellants.

Dan B. Cowie, Asst. U. S. Atty., of Topeka, Kan. (S. M. Brewster, U. S. Atty., of Topeka, Kan., on the brief), for the United States.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

Appellants and 41 other named defendants were charged by indictment with conspiracy to violate the National Prohibition Act. The indictment charged that the defendants in Sedgwick county, Kansas, from about February 15, 1930, to May 12, 1930, unlawfully conspired and agreed to unlawfully manufacture, transport, and sell intoxicating liquor.

It further alleged it was agreed that in the execution of such conspiracy appellants, Marcus Gorges, William Norton, Joe Hockderffer, A. L. "Slick" Norton, Art Kraus, George "Goldie" Nelson, and 30 other named defendants should engage in the business of unlawfully manufacturing, possessing, transporting, and selling intoxicating liquor in the State of Kansas; that another named defendant should act as the representative of the several conspirators to offer and give certain money to John B. Madden, assistant prohibition administrator for Kansas, to induce Madden to violate his official duties by permitting the several conspirators to unlawfully manufacture, possess, transport, and sell intoxicating liquor.

The indictment alleged 21 overt acts in furtherance of the execution of such conspiracy.

The first three charged certain payments made by certain of the defendants to Madden to secure "protection." The fifth charged the sale on May 11, 1930, by A. L. Norton of ten gallons of whisky. The sixth to sixteenth, inclusive, charged that certain of the defendants manufactured, possessed, transported, and sold intoxicating liquor in Sedgwick county. The seventeenth charged that Fred Ijams possessed, transported, and sold intoxicating liquor in Reno county. The nineteenth charged that Joe Thomas sold four drums of alcohol in Sedgwick county on April 7, 1930. The twenty-first charged that Al Simons between February 15 and May 12, 1930, assisted Gorges in securing locations for certain stills in Sedgwick county, Kansas.

The evidence tended to establish the following: Gorges was the head of a group which desired to engage in the unlawful manufacture, possession, transportation, and sale of intoxicating liquor in and about Sedgwick county, provided they could secure "protection" from federal prosecution. After certain preliminary negotiations, Gorges on February 14, 1930, entered into an arrangement through a representative whereby he was to pay Madden $1,000 a month and send to Madden a list of his still locations, and Madden was to furnish "protection" to Gorges and his associates in the unlawful manufacture, possession, transportation, and sale of intoxicating liquor. Madden entered into such arrangement with Gorges, under instructions from his superior, for the purpose of securing evidence of bribery against Gorges and a list of his still locations.

Gorges made payments of $1,000 each to Madden through an intermediary on February 15, April 1 and May 1, 1930.

Gorges and his associates engaged in the unlawful manufacture, possession, transportation, and sale of intoxicating liquor from about March 1 until May 12, 1930. In March, 1930, Gorges sent a list of his still locations to Madden and also a list of certain places which he wanted the prohibition officers to

raid. The place of Joe Thomas was included on the latter list.

Madden sent Brice F. Armstrong, a prohibition agent, to Wichita. Armstrong held out that he was Madden's personal representative and pretended that he desired to cooperate with Gorges in affording him and his associates "protection." In fact his purpose was to secure additional evidence against Gorges and his associates.

The finding of the jury that appellants were members of the conspiracy charged rests solely upon the following: Simons was a brother-in-law of Gorges, and during the period between February 15 and May 12, 1930, was frequently in the company of Gorges. Simons knew of the arrangement between Gorges and Madden.

On April 12, 1930, Armstrong met Gorges, Simons, and Hockderffer at the home of Gorges in Wichita. From there they went to the Hockderffer still and secured some whisky, which they drank. Gorges said he wanted to create a new district in the vicinity of Chickasha, Oklahoma; that he wanted Hockderffer to take Armstrong to Chickasha and there introduce him to certain liquor dealers, and that he wanted Simons to organize the Oklahoma territory. Simons told Armstrong he had not been engaged in the liquor business for two years past; and that he was going down and take charge of the Oklahoma district.

Gorges gave Madden the location of an alcohol stripping plant operated by Joe Thomas and requested Armstrong to raid such plant.

. On the night of April 7, 1930, Armstrong, Gorges, and Thomas drove in an automobile belonging to Thomas from the home of Gorges to a point about eleven miles from Wichita, where they met a Ford truck. They accompanied this truck to the farm of Art Kraus, where they unloaded four drums of alcohol from the truck into a wagon, and then returned to Wichita. On the way out, Thomas and Gorges discussed the price of the alcohol. Thomas told Gorges he was making a price of six dollars a gallon in 500 gallon lots only; that Gorges had only taken 200 gallons and that he expected him to take 300 more.

About April 15, 1930, Armstrong and Gorges went to Hutchinson and there saw William Norton. Gorges had a conversation with Norton about four drums of alcohol which he had sent the latter. Gorges said Thomas insisted there were 55 gallons instead of 52 in each of such drums. Gorges said twenty-four dollars was still due to Thomas. Thomas was not present at this conversation.

About April 3, 1930, Gorges told Armstrong that William Norton, A. L. "Slick" Norton, and Ijams were customers of his and were selling his whisky. Ijams was not present at this conversation.

On the journey last above referred to, Gorges and Armstrong met Ijams on the road near his house. Ijams told Gorges he had 250 gallons of Kansas City alcohol on hand and 150 gallons of the last liquor he had got from Gorges. He also stated that Gorges' whisky was "rotten" and that he did not want any more of it. He paid Gorges $100 on a $600 account and said he would let him know if he wanted any more "stuff." On the way back Gorges told Armstrong that William Norton and Ijams did not get along; and that he did not want either to know that he was dealing with the other. Later Gorges stated to Armstrong that Ijams had told him he did not need any more whisky, that Ijams had put up a small still, and that he wanted Armstrong to raid Ijams' still and arrest him.

At the close of all the evidence each of the appellants moved for an instructed verdict of not guilty. These motions were denied. Appellants and fourteen other defendants were convicted and sentenced. Appellants have appealed.

Appellants challenge the sufficiency of the evidence to sustain the verdicts of guilty returned against them.

■ To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established. Pope v. United States (C. C. A. 3) 289 F. 312, 315; Kelton v. United States (C. C. A. 3) 294 F. 491, 495; Isenhouer v. United States (C. C. A. 8) 256 F. 842; United States v. Goldberg, 7 Biss. 175, Fed. Cas. No. 15,223; United States v. McKee, 3 Dill. 551, Fed. Cas. No. 15,686; Burns v. United States (C. C. A. 8) 279 F. 982, 986; Dolan v. United States (C. C. A. 9) 123 F. 52; Slager v. United States (C. C. A.) 233 F. 510.

■ Declarations made by one conspirator to another are not competent evidence to establish the connection of a third person with the conspiracy. Kuhn v. United States (C. C. A. 9) 26 F.(2d) 463; United States v. McKee, supra.

■ The existence of the conspiracy charged cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged co-conspirator done or made in his absence. Hauger v. United States (C. C. A. 4) 173 F. 54, 57; United States v. Richards (D. C. Neb.) 149 F. 443; United States v. Goldberg, supra; United States v. McKee, supra.

■ Therefore the statements made and acts done by Gorges in the absence of appellants should not be considered in determining whether the evidence established the connection of appellants with such conspiracy.

The only evidence against Thomas is an isolated unlawful sale of intoxicating liquor. There was no proof that Thomas had knowledge of or was connected with the conspiracy. Gorges from the very beginning expressed a desire that the officers secure evidence against and prosecute Thomas in order to eliminate his competition. This strongly indicated that Thomas was not connected with the conspiracy.

The evidence established that Simons had knowledge of the conspiracy. It further proved that Gorges desired to extend the conspiracy to Oklahoma, and he and Simons planned that the latter should take charge of the business there, but there was no proof that the conspiracy was ever so extended or that Simons ever entered it. Furthermore the indictment charged a conspiracy to manufacture, possess, transport, and sell intoxicating liquor in Kansas.

■ Mere knowledge or approval of or acquiescence in the object and purpose of a conspiracy without agreement to cooperate to accomplish such object or purpose is not enough to constitute one a party to the conspiracy. Lucadamo v. United States (C. C. A. 2) 280 F. 653, 657; Marrash v. United States (C. C. A. 2) 168 F. 225; Turcott v. United States (C. C. A. 7) 21 F.(2d) 829; United States v. Lancaster (C. C. Ga.) 44 F. 896, 10 L. R. A. 333.

The most that can be said is that Simons knew of and acquiesced in the conspiracy and was willing to enter it provided the organization was extended to Oklahoma. This was insufficient to connect him with the conspiracy charged.

Ijams was engaged in the sale of liquor and purchased some whisky from Gorges. Aside from the statement of Gorges to Armstrong that Ijams was to be protected, which was not made in the presence of and was not binding on Ijams, there was no evidence showing that Ijams had knowledge of or was connected with the conspiracy. While the evidence proved that Ijams had purchased whisky from Gorges prior to April, 1930, it also showed he was buying liquor from Kansas City and operating his own still. It was not shown that the purchase from Gorges occurred during the existence of the conspiracy. Furthermore, in April Gorges told Armstrong to secure evidence against Ijams and prosecute him. We think the fair inference from this evidence is that Ijams was an independent operator and not a member of the Gorges liquor ring.

■ We conclude that the trial court erred in overruling appellants' motions for directed verdicts of not guilty.

Reversed and remanded with instructions to grant appellants a new trial.